WILLIAMS, ADMINISTRATOR, *v.* LAUDERDALE.

4-7767                                                    191 S. W. 2d 455

Opinion delivered December 3, 1945.

*T. B. Vance* and *Will Steel*, for appellant.

*Shaver, Stewart & Jones*, for appellee.

ROBINS, J. Appellant, as administrator of the estate of Mrs. Lena Neal, deceased, and as administrator of the estate of Miss Autie Neal, deceased, instituted this action against appellees, C. J. Lauderdale and his wife, to recover damages for each estate in the sum of $25,000 for conscious pain suffered by both intestates from injuries which caused the death of each of them. The deceased ladies were living in an apartment owned by appellees and they lost their lives in a fire which destroyed the apartment on the morning of January 18, 1945.

In his complaint appellant alleged that appellees, (1) negligently failed to have the electric wires in the apartment properly insulated, (2) negligently failed to have the hall equipped with an electric light burning through the night, (3) negligently failed to have the building equipped with fire escapes or knotted ropes as required by § 7201 of Pope's Digest, and (4) negligently failed to keep the equipment connected with the hot water heater in proper repair, thereby permitting gas to escape and to become ignited; and that said acts of negligence combined together to cause suffering and death of appellant's intestates.

The answer of appellees was a general denial.

On trial below the second and fourth grounds of negligence—failure to keep a light burning in the hall and failure to maintain properly the hot water heater connections—were apparently abandoned and no testimony tending to support them was introduced. For recovery appellant relied on the first and third grounds—that appellees were negligent in permitting the electric wiring in the apartment to remain in an unsafe condition and without proper insulation, and that they were negligent in not equipping the apartment with proper fire escapes or knotted ropes as required by law.

At the conclusion of the testimony offered by appellant, the lower court sustained appellees' motion for a peremptory instruction in their favor, basing this instruction on the ground that appellant had failed to prove conscious pain and suffering on the part of appellant's intestates. From judgment entered on the verdict thus rendered appellant prosecutes this appeal.

Under appellant's theory as to liability, before he could be entitled to have the case submitted to the jury, it was necessary for him to offer substantial testimony tending to prove:

(1)  That appellees negligently failed to keep their property in a proper state of repair; or that the premises constituted a hotel or inn and was not equipped with ropes or fire escapes as required by the statute.

(2)  That the fire was proximately caused by appellees' negligence in not properly maintaining the property; or that injury to the ladies from the fire was caused by appellees' failure to provide safety equipment prescribed by law.

(3)  That as a result of said fire appellant's intestates were caused to undergo conscious pain and suffering prior to death.

Appellees owned a two-story brick building in Texarkana, Arkansas. On the lower floor of this building appellees were operating an electric appliance business. The upper floor, reached only by a wooden stairway from the front, was divided into ten rooms, rented out in apartments to different tenants. The front apartment, consisting of five rooms, including bathroom and kitchen, was occupied by Mrs. Lena Neal and her daughter, Miss Autie Neal, who rented it from appellees by the month. Appellees furnished all "utilities" except the telephone.

The fire occurred about 4 o'clock in the morning, and when the firemen, whose station was only about four blocks away, arrived, the building was full of smoke and was already badly damaged from the flames, which were coming from the upstairs windows and beginning

to break through the roof. After subduing the fire to some extent, the firemen entered the building and found the body of Miss Neal about ten feet from the top of the stairway, and the body of Mrs. Neal was found near one of the front windows. Both bodies were badly burned.

Considering the action of a trial court in directing a verdict for the defendant, Judge FRAUENTHAL, speaking for the court, in the case of *Wortz* v. *Ft. Smith Biscuit Company*, 105 Ark. 526, 151 S. W. 691, said: "In reviewing this ruling of the court directing a verdict, the evidence adduced upon the part of the plaintiff must be considered in the light most favorable to his cause of action. If under that evidence, however, with every reasonable inference of fact that is deducible therefrom, the plaintiff is not under the law entitled to a recovery, then the ruling made by the court is correct."

Section 7201 of Pope's Digest, violation of which by appellees is one of the grounds relied on by appellant herein, is as follows: "It shall be the duty of every person operating any hotel, or inn containing seven rooms or more, two stories high or more, within the State of Arkansas to have a rope not less than one-half inch in diameter and knotted not more than fifteen inches apart, and of sufficient strength to hold up five hundred pounds and long enough to extend within twenty-four inches of the ground. Said rope to be securely attached to the window sill, or wall of one window in each room about the first story of said building to be occupied by guest. Said rope to be kept in full view at all times. This section not to apply to hotels equipped with iron fire escapes, and any proprietor, lessee or manager of any hotel, or inn refusing to comply with the provisions of this act shall be guilty of a misdemeanor, and, on conviction, such proprietor, lessee, manager, agent or clerk in charge of said hotel or inn, whenever any violation of this act shall occur shall be fined not less than ten dollars nor more than fifty dollars, or imprisonment for a term not exceeding thirty days, or by such fine and imprisonment."

By its terms, the operation of this statute is limited to an "inn" or "hotel." In the case of *Pettit* v. *Thomas,*

103 Ark. 593, 148 S. W. 501, 42 L. R. A., N. S. 122, Ann. Cas. 1914B, 726, this court quoted with approval this definition by Mr. Bishop in his work on Non-Contract Law, § 1165: " 'An inn, hotel or tavern is a house for the general entertainment of travelers and strangers applying . . .' " "An apartment house is clearly not a hotel, each apartment therein being regarded as a separate dwelling of which its occupant is the tenant." 28 Am. Jur. 544. "An inn or hotel is essentially an establishment which provides lodging for transients . . ." 43 C. J. S., Innkeepers, § 1, p. 1128. "An apartment house is not a hotel, but is a building used as a dwelling for several families, each living separate and apart. . . ." *Satterthwait* v. *Gibbs,* 288 Pa. 428, 135 A. 862; *Pierce* v. *Kelner,* 304 Pa. 509, 156 A. 61. See, also, *Scanlan* v. *LaCoste,* 59 Colo. 449, 149 Pac. 835, L. R. A. 1915F 664, Ann. Cas. 1917A, 254.

There was no testimony in this case tending to establish that appellees were operating the property as a hotel or inn; and, therefore, no liability against appellees could be predicated on their failure to equip their building in accordance with the requirements of the above quoted statute.

As to the remaining charge of negligence—failure to maintain the electric wiring in a safe manner—it may be said that there was proof sufficient to authorize the jury to find that the building was wired in an unsafe manner—one likely to cause a fire—and that appellees had been warned of such danger.

But it was necessary for appellant to prove further that this faulty wiring was the cause of the fire. To discharge this burden appellant introduced Mr. Steve Walsh, chief of the Texarkana fire department, who reached the fire shortly after the alarm was given. After testifying that he had previously seen the wiring and found it "very bad" he detailed the condition of the wiring, which was "what they called romax cables—two wires and one sheathing and in place of having them put up with clamps, they had them nailed with a nail. It was in bad shape where it run over the partitions of the rooms.

It ran over the partitions without any insulation of any kind or protection from the wood. . . . The probable result of [such] wiring . . . would cause a fire. In my opinion, the condition I found there in regard to the defective wiring was the cause of the fire. . . . I could not tell after the fire whether the electric wires and conductors were fused together. The insulation was pretty well burned off. The wires in the center of the building were burned up and melted down. The wiring was there but the insulation was off. I do not remember whether the wiring was fused together. It could have been, the fire was hot enough.'' But Mr. Walsh said in his cross-examination: ''Q. Now, chief, you said to Mr. Vance that the wiring could have caused that fire? A. Yes. Q. Is there anything else that could have caused it? A. Yes, a number of things. Q. Name some of them. A. A match or a lighted cigarette— Q. A match or a lighted cigarette or a pilot light or a hot water heater in the bathroom? A. Yes. Q. Any number of things could have caused it? A. That's right. Q. And the wiring was one of them? A. Yes. Q. But from your inspection you made, you don't know what did cause the fire? A. No, sir.'' The chief of the· fire department did not testify as to any physical condition found by him in the damaged building that would, with that degree of certainty that ex-. cludes speculation, indicate that the fire was started by ''bad wiring'' or that would eliminate from consideration other possible causes.

Other witnesses for appellant testified as to the defective condition of the wiring, but none of them testified any more definitely as to the cause of the fire than did the chief of the fire department; and their testimony adds no additional weight or substance to the case as made out by Mr. Walsh's testimony.

We have then this situation: A building burned in the early hours of the morning; no direct proof as to the origin of the fire; proof that the electric wiring was faulty and liable to cause a fire; and the opinion of one testifying as an expert, but not detailing on what objective findings his opinion was based, that the fire was caused by this defective wiring. The force of the fire

chief's opinion, even if it were competent, is destroyed by the remainder of his testimony, which shows that his statement was more in the nature of a conjecture than the expression of a firm conviction based on findings in the physical situation made by the witness.

The weight of authority is that the cause of a fire is ordinarily not in the category of matters on which expert opinion is admissible as evidence.

The Court of Appeals of Kentucky, holding inadmissible testimony of chief of fire department that, in his opinion, "the fire had been laid by somebody," in the case of *King* v. *Ohio Valley Fire & Marine Insurance Company*, 212 Ky. 770, 280 S. W. 127, said: "His statement that he found the fire had been laid by somebody was objectionable. He should tell what he found, and let the jury draw the conclusion."

In the case of *Miller* v. *Great American Insurance Company*, 61 S. W. 2d 205 (Mo.), it was held that the trial court properly rejected the testimony of two fire chiefs of long experience in fighting fires to the effect that, in their respective opinions, the fire in question was an incendiary one. The court, in that case, said: "With the subject of inquiry having been one within the range of the common experience of people moving in the ordinary walks of life, there was no room for the admission of opinion evidence. . . ."

The Supreme Court of North Carolina, in the case of *Deppe* v. *Atlantic Coast Line R. Co.*, 154 N. C. 523, 70 S. E. 622, held inadmissible the testimony of certain witnesses that, in their opinion, a fire had resulted from a certain cause, saying: "The evidence admitted was not 'expert testimony' in any sense, as the facts are such that one person may as well draw conclusions from them as another."

To the same effect is the holding in the case of *Rodefer* v. *Grange Mutual Insurance Company* (Mo. App.), 91 S. W. 2d 112, in which the court said: "The issue of how the fire had been caused was one concerning which the jurors, as ordinary men, were fitted to draw

the correct conclusion from all the facts in evidence, and any opinion which the witness may have entertained upon that question was therefore properly excluded.''

The Supreme Court of Iowa, in the case of *Walters* v. *Iowa Electric Company,* 203 Iowa 467, 212 N. W. 886, holding that opinion of witness, as to origin of fire alleged to have been caused by negligent maintenance and operation of electrical line, was inadmissible, quoted from the case of *Kelly* v. *Muscatine, B. & S. R. Co.,* 195 Iowa 17, 191 N. W. 525, saying: " 'We are committed to the rule that, when all the pertinent facts can be sufficiently detailed and described to enable the jurors to form a correct conclusion without the aid of opinions, no exception to the rule excluding opinion evidence will be tolerated.' "

An examination of the record discloses that there was adduced no substantial testimony from which it could be reasonably found by the jury that the cause of the fire was the defective wiring.

This holding precludes the application of the doctrine of *res ipsa loquitur,* which is invoked in this case by appellant. Before this rule may be applied it must be shown that the injury complained of was caused by an agency or instrumentality under the exclusive control of the one against whom liability is asserted, and, in such a case, it creates a presumption of negligence against the one in control of the agency or instrumentality causing the injury, where it is shown that, in the ordinary course of things, the injury would not have occurred if proper care had been exercised. *Arkansas Light & Power Company* v. *Jackson,* 166 Ark. 633, 267 S. W. 359; 45 C. J. 1193.

As was said by appellant's principal witness, Chief Walsh, the fire, in the instant case, may have been started by one or more causes, for which appellees could in no event be held responsible. In 38 Am. Jur. 1000, it is said: "Nor does it (the *res ipsa loquitur* rule) apply where an unexplained accident may be attributable to one of several causes, for some of which the defendant is not responsible." This rule was applied by us in the case

of *Oklahoma Gas & Electric Co.* v. *Frisbie*, 195 Ark. 210, 111 S. W. 2d 550.

The decision in the case of *Burt* v. *Nichols*, 264 Mo. 1, 173 S. W. 681, L. R. A. 1917E, 250, cited by appellant in support of his contention that the rule of *res ipsa loquitur* applies, is not controlling here, because liability in that case was predicated upon a violation of an ordinance requiring fire escapes, which was held to be negligence *per se*.

Since we have found that there was no substantial testimony to show liability on the part of appellees, it becomes unnecessary for us to consider the sufficiency of proof of conscious pain and suffering of the two ladies. If the judgment of the lower court was correct, it must be affirmed, even though we may not agree with the reason given by the lower court for its action. Thus, in the case of *Millsaps* v. *Nixon*, 102 Ark. 435, 144 S. W. 915, we affirmed the judgment of the lower court based on a directed verdict, although we held that the motion for peremptory instruction should have been sustained on a ground other than that upon which the trial court based it. In that case, it was said: "A judgment may be correct, although based on mistaken reasons." Another case in which the same ruling was made is: *New York Life Insurance Company* v. *Adams*, 151 Ark. 123, 235 S. W. 412.

Nor is it necessary for us to consider the question (not raised by the parties herein) as to whether a landlord may, in the absence of statutory requirement or contractual undertaking, be held liable for injury suffered by a tenant on account of the unsafe condition of the demised premises.

The judgment of the lower court is affirmed.

McFADDIN, J., dissenting. The majority holding is not based on, and does not discuss, the issue of conscious pain and suffering; so I, likewise, forego any discussion of that question, although it was the basis of the decision in the trial court.

The majority opinion upholds the verdict, directed for the defendants, on the ground that there was no evidence that the fire was caused by the defective wiring. I respectfully dissent, because I believe there was sufficient evidence to take the case to the jury on this issue.

The rule governing lower courts in directing a verdict for the defendant is stated in *New York Underwriters' Insurance Company* v. *Stewart,* 190 Ark. 718, 81 S. W. 2d 844:

"It is the established law in this state that a verdict should not be directed by the trial court except in cases where, conceding the credibility of the witnesses testifying and giving full effect to all legitimate inferences deducible therefrom, it is plain and certain that the parties directed against cannot recover. *St. Louis, S. F. Ry. Co.* v. *Pearson,* 170 Ark. 842, 281 S. W. 910. *Graysonia, Nashville Lbr. Co.* v. *Carroll,* 102 Ark. 160, 143 S. W. 923."

In 53 Am. Juris. 316 the rule is stated:

"The trial court is bound to consider the reasonable inferences from the evidence, on a defendant's motion for a directed verdict. The evidence must be considered most favorably to the plaintiff; the inferences most favorable to him are to be drawn, and inferences in favor of the defendant rejected. . . . On a defendant's motion for a directed verdict, the evidence and inferences must be construed most favorably to the plaintiff, and most strongly against the defendant. Evidence for the plaintiff is assumed to be true. Otherwise stated, the court must take the strongest legitimate view of the evidence in favor of the plaintiff and disregard all countervailing evidence."

With these established principles in mind, we turn to the majority opinion, which says:

"An examination of the record discloses that there was adduced no substantial testimony from which it could be reasonably found by the jury that the cause of the fire was the defective wiring."

It is this quotation that impels this dissent.

In addition to the testimony of Walsh (mentioned in the majority opinion), there was the testimony of at least three other witnesses on the nature and effect of the defective wiring: (a) H. E. Gibbons testified that he had been twenty years in the electrical business and was familiar with the use of Romax wiring; that the National Electrical Code contained the rules as to the wiring of buildings, and was the recognized standard code by which all electricians were guided; and that rule 3206 of the Code provided that Romax wiring should be fastened to the wall only with an insulated staple, which was to be on the outside of the two insulated wires. Gibbons stated that to drive a nail between the two wires was very improper: "you can hardly drive nails between without breaking your insulation. It might stand up for a while, but in time it will give you trouble." Without objection, the following testimony was given by this witness:

"Q. When you drive a nail in there, it would, to a certain extent, damage the insulation? A. Yes, sir. Q. And it would weaken it at that point and make it come in contact with it or get close to it? A. And that would destroy the insulation. Q. And that, in your opinion and from your experience, would produce a fire ultimately? A. That's right."

.   .   .   .   .

"Q. Assuming that a wire like that was used, Mr. Gibbons, and the nail did come in contact with the wire, would that likely cause a short? A. If it came in contact with the wire, yes. Q. If it came in contact with the wire and caused a short, would that tend to destroy the webbing in those two wires in that Romax tubing? A. In the course of time. Q. If there was a short there, what would happen? A. That would cause your spark to start a fire. When you have a short, it is going to break down at the weakest point. Q. Two wires when they are uninsulated will fuse together? A. That's right. Q. Assuming that a building was wired in that manner and after the fire you found the Romax wires

fused together. What would be the cause of that? A. They got together or they wouldn't fuse together."

· (b)  Pat McDaniel testified that he had worked as an electrician for ten years and had lived in the Lauderdale Apartments, and that he was familiar with the type of wire used in the Neal apartment, that the wiring was Romax: "in other words, those two wires are wrapped together and insulated"; and that after the fire he made a personal examination of the Lauderdale building to see where the fire had burned the most, and that it was in the Neal apartment.

(c)  Clovis Neal testified that he was an electrician of five years' experience, and that after the fire he examined the wiring in the Neal apartment; that he found several places where the Romax wiring was fused together, and that the wires would not have been fused together by the fire, but only by a short.

So, we have a case where it was shown: (1) that Romax wiring was used in the Neal apartment; (2) that the wiring was defectively installed and in violation of the National Electrical Code, in that the wiring was fastened by nails instead of insulated staples; (3) that Mr. Gibbons, an electrician of twenty years' experience, said that such a defective wiring was likely to cause the wires to fuse and result in a fire; (4) that a fire did occur in the Neal apartments where the defective wiring existed; (5) that after the fire the wires were found to have been fused; and (6) that it was testified that the wires would not have fused by reason of the fire but only by reason of a short circuit. What more evidence could have been offered as to what caused the fire than this testimony that was offered?

Only one additional bit of evidence could have been offered: and that was the electrical experts could have been permitted to testify that in their opinion, as experts, the fire was caused by the defective wiring. I think they should have been so permitted to testify. These witnesses were testifying as electrical experts as to what would be the effect of a short in electrical wiring. The

cases cited by the majority are cases where firemen were not permitted to testify as to what caused a fire. The situation here is whether experts in electricity should be permitted to testify as to the possible or probable result of a short in electrical wiring. But the majority says the electrical experts should not be permitted so to testify, and I pass that point without taking time to cite authorities.

However, I insist that if the electrical experts cannot say what in their opinion caused the fire, then certainly it is for the jury to answer the question. Surely, somebody should be able to give the answer to the question from all the evidence that was adduced. The majority holds that the experts cannot tell what caused the fire, and then goes further and says that the jury is not to be allowed to find what caused the fire. The reason assigned by the majority, for denying the jury the right to make a finding of fact, is that there was no evidence tending to show that the defective wiring caused the fire. In answer to the majority, I have quoted or sketched the testimony of the witnesses. This testimony impels this dissent.