BROWN *v.* MARSHALL ICE & ELECTRIC COMPANY.

4-7839                                          193 S. W. 2d 135

Opinion delivered March 18, 1946.

*N. J. Henley,* for appellant.

*W. F. Reeves* and *T. J. Gentry,* for appellee.

GRIFFIN SMITH, Chief Justice. W. E. Brown was awakened about two o'clock the morning of March 15, 1945. His explanation of the cause was: "I heard something that sounded like the Frigidaire running in the room where I was sleeping. . . . The light [fixture] in that room had a three-way connection, [with] the globe in the bottom, and it was cut off by the door in that switch; and I raised out [of bed] and couldn't tell whether it was in that; and fire was shooting out of those holes. I also heard this noise in the radio, and went outside and pulled the [main] switch, like I always did—and [as the folks do, too, when we have trouble] like an electrical storm."

The switch was left "off" during the remainder of the night; but the next morning at 9 o'clock Brown went to Marshall Ice & Electric Company's office and talked with Herbert Wright, a repair man, asking that the trouble be adjusted. About five hours later Wright went to Brown's home, worked on the so-called "three-way" drop and remarked, "I think that is your trouble." The Brown family went to a neighbor's home after a lapse of twenty or thirty minutes following Wright's leave-taking, and soon observed smoke or fire coming from the roof or "upper part" of the house.

Brown's testimony is that he heard a "hissing" or "crackling" noise in the attic. While the switch was in position to disengage the flow of current, Mrs. Thelma Cypert (Brown's daughter) climbed into the attic. She testified her father turned the switch on and "I heard the wire over the front room 'crackle' and 'fry'."

Brown says he told Wright about the "hissing" sound in the attic and asked him (Wright) if he didn't intend to go up there, but was assured the trouble was with the socket or its connections in the room where Brown saw the fire.

It was shown that although Wright was regularly employed by Marshall Ice & Electric Company as "trouble shooter," he was permitted to do repair work on his own account and was allowed to retain charges for such. There is an absence of substantial testimony showing that Wright, in working for Brown or for anyone in similar circumstances, was accountable to the Electric Company. On the contrary, there is proof of non-participation. The jury was instructed to return a verdict for the Company, but it was permitted to determine whether the fire was occasioned because wiring or fixtures became unreliable, and whether Wright was guilty of negligence in failing to inspect the attic wiring. By its verdict the jury found in effect that the fire was caused from a short circuit, and that Wright was negligent.

It is not necessary to pass upon sufficiency of the evidence tending to show employer and employe relationship between the Company and Wright. When we decide, as we do, that the verdict against Wright for $900 was based upon speculation, other matters become unimportant.

Wright concedes that Brown mentioned to him what was thought to be a "crackling" sound in the attic; but the fact remains that the "drop." to which the three-way light socket was connected came through the ceiling, and Brown's definite testimony is that when he awoke during the electric storm fire was coming from the three apertures, indicating that each was faulty, or that the "drop" connection or receptacle wiring was broken or loose. But Brown goes further and says there was noise in his radio, and that "fire was shooting out of it."

The terms "crackling," "frying," "hissing," etc., are clearly intended to convey the impression that a short circuit of considerable proportions had occurred, from which fire could, and naturally would, spread. The evidence, as abstracted, does not show how the radio and Frigidaire were connected. The latter operates from a motor and requires appreciably more current than an ordinary incandescent light bulb. Such installations are

frequently wired for 220 volts as distinguished from 110 volts usually utilized for incandescent lighting. Neither Wright nor Marshall Ice & Electric Company had anything to do with original installation of the wiring system.

Brown's assertion that the only thing Wright did was to examine "the light socket in the front room" was supported by his wife's testimony. The latter, on cross-examination, made the statement that ". . . during the time Mr. Wright was [at our house] we heard no sparkling in the attic."

The evidence shows that when Wright arrived the main control switch was "off" and it was not turned on again until Brown, at Wright's direction, closed it after certain repairs had been made on the drop or connections in the living room where fire was seen to come from the fixture openings.

The defendants requested instructed verdicts on the ground that there was no substantial evidence to show that the fire originated because of faulty wiring and that Wright was not negligent. Brown's testimony that after Wright adjusted the main-room "drop" and the current was turned on, he did not thereafter hear the attic noise is significant. He contends, however, that in spite of the admitted adjustment of the drop and at least temporary elimination of the noise complained of, Wright and the Electric Company should be held liable for the consequent loss—Wright because he failed to go into the attic, and the Company as Wright's principal.

It has been consistently held that speculation may not be substituted for fact or reasonable inferences, and that a judgment so predicated cannot stand. In the instant case it is not shown that Wright held himself out as an expert, or as a guarantor of results. But this would not be necessary if the fire resulted from his negligence. In its final aspect the situation is that Brown, his wife, and his daughter, thought they heard a "crackling" sound in the attic. Other expressions from the same witness are that the noise appeared to come from a point near where the main-room drop came through the ceiling. Admittedly

there was trouble with this drop, and admittedly it was ostensibly repaired, for Mrs. Brown testified that while Wright was in their home and presumptively after he had worked with the ''drop'' and fixture the ''crackling'' could not be heard. The system functioned efficiently after the ''drop'' was repaired. There was no further ''fire,'' ''crackling'' or ''frying.''

Did Wright, as a reasonably prudent man, have a right to think that the difficulty had been overcome?—While the answer to that question would seemingly absolve him, it is not necessarily reached in the determination of this case because origin of the fire was purely speculative. That being true, the defendants were entitled to directed verdicts. *Williams, Administrator, v. Lauderdale, ante,* p. 418, 191 S. W. 2d 455.

The judgment against Wright is reversed and the cause is dismissed. The instructed verdict in favor of Marshall Ice & Electric Company is affirmed.

SMITH, J. (dissenting). Under the direction of the court a verdict was returned in favor of the Electric Company, but the liability of Wright, who designated himself as the Company's ''trouble shooter,'' was submitted to the jury, under instructions which were not only not objected to, but are not abstracted in either brief. There is a conclusive presumption, therefore, that the case was submitted to the jury under correct instructions.

The majority do not distinguish between the liability of the trouble shooter, and that of the company, and I shall not do so, as the majority hold that neither is liable.

It confuses the issue in this case to consider whether the company or its employee were insurers, as no such contention was made or submitted to the jury. Divested of all extraneous issues the question for decision is whether the testimony is sufficient to sustain the finding that the fire was occasioned by Wright's negligence, or would have been averted had Wright not been negligent, and this, I think, was a question of fact which should have been, and was, submitted to the jury.

In this, as in all other cases, we give the testimony tending to sustain the judgment in favor of appellee its highest probative value in testing its legal sufficiency to sustain the verdict, but here Wright's own testimony, in my opinion, made a case for the jury. It was to the following effect. He is a salaried employee of the Electric Company, and his duties are to maintain and repair the machinery, lines and equipment of the company. Other work done by him is done on his own account, and the company has no interest in it, as the responsibility of the company ceases at the meter. We copy from Wright's testimony the following statement: "I examined the trouble as I saw it. Brown told me about his daughter going up into the attic and hearing noises. By my experience of 15 or 20 years I did not suppose there would be any trouble. After I had examined the light socket and fixed it I told Brown that there was no other danger. I didn't think there was any other danger. He didn't ask me to go in the attic, but asked me what I thought about it. I heard no noises. It would have blown a fuse if there had been a short sufficient to cause trouble, if the fuse were proper size. I made the best inspection under the information that was given me which was possible. I made a reasonable and honest investigation."

But other testimony supports the finding that Wright did not make a reasonable or intelligent investigation, and certainly not a sufficient investigation. Brown was awakened in the middle of the night by flashes of light, from the socket in his bedroom, and by a cracking noise in the attic, and he disconnected the switch which conducted the electric current into his house, and it was not reconnected until after Wright arrived at Brown's home. Wright came to Brown's home in pursuance of his employment, to repair known defects, and was told where they were, one in the light socket, the other in the attic. Wright repaired one defect but made no examination of the other, because in his opinion the trouble which he found in the light socket would account for the trouble in the attic. It is certain, however, that the trouble in the light socket, which was repaired, did

not account for the trouble in the attic, where the fire originated. We think this testimony warranted the jury in finding that Wright did not exercise the care which a reasonably prudent man would have exercised and we think the finding was warranted, indeed is inescapable, that the failure to ascertain and remedy the trouble in the attic was the cause of the fire.

The law of the case is stated in § 100 of the Chapter on Electricity, 18 Am. Jur. 496, as follows: "The negli-gence of an employee of an electric company in reporting that a defect which he had been sent to repair had been remedied when in fact it had not been is imputable to the company, rendering it liable for an injury caused by such defect." We do not inquire whether Wright was acting for himself alone, and not for the company, as the major-ity hold that there is no liability in either case. But it appears to be an elementary statement of the law that Wright is responsible for the consequence of his own neg-ligence, whether that negligence is imputed to the com-pany or not.

Of course, to sustain the verdict in this case the tes-timony must show not only that Wright was negligent, but also that this negligence was the proximate cause of the injury, and the testimony to support that finding must not be based upon mere speculation or conjecture. Now no one saw the fire start, which burned Brown's house, but if that requirement is to be imposed, electric companies have been granted immunity for all practical purposes from the negligence of their employees.

But is it mere speculation to say that the defect in the attic to which Wright's attention was specifically called caused the fire? We think the jury was warranted in finding that the defect in the attic caused the fire, and that it is not a matter of conjecture and speculation to so find. We have here a cause and an effect, which logically followed. After the socket had been repaired, the switch was restored so that the electric current would enter the house. Brown and his wife went to the home of a neigh-bor to get some shrubs to plant, and in from 20 to 30 min-

utes after leaving their house, they discovered it was burning. The fire was in the attic. The defect which Wright did not repair was a known cause and no other cause was shown or suggested, and if there is any speculation about the origin of the fire, the speculation is that it was not caused by the known defect, but might have originated from some other cause of which there was no evidence. The sequence of events refutes the speculative theory that there was any cause other than the defective wiring in the attic, and in my opinion, the case should not be dismissed, and I therefore dissent and am authorized to say that Justices McFADDIN and MILLWEE concur in that view.