HUDSON CHEVROLET COMPANY, INC. *v.*
DONALD R. SPARROW

5-5585                                              467 S. W. 2d 751

Opinion delivered June 7, 1971
[Rehearing denied June 28, 1971.]

*Robinson & Robinson,* for appellant.

*Smith, Stroud, McClerkin & Conway,* for appellee.

JOHN A. FOGLEMAN, Justice. Hudson Chevrolet Company, Inc., seeks reversal of a $7,500 judgment in favor of Donald Sparrow. It contends that this judgment was erroneous for want of a jury question on liability, because of erroneous admission of photographs into evidence, and because the amount of the jury verdict was excessive. We find that the judgment must be affirmed.

We will review the evidence favoring appellee in the light most favorable to him, as we must. Appellee Sparrow rented a garage apartment from appellant. His occupancy commenced on March 2, 1969, when he and his bride of a few days moved in. On the following day they returned after being away from the apartment and found their towels singed, and shower curtain and window shades burned as a result of a fire of some sort which had obviously occurred in the bathroom during their absence. The gas stove was burning in the bathroom both when the Sparrows left and when they returned. It was the only stove burning in the apartment on that day. Sparrow said that he reported the incident to his landlord on the next day and requested of the gas company that a check be made for gas leaks. Sparrow testified that he had smelled a "dirty" odor in the apartment prior to the first fire, which he had then thought was attributable to natural gas. Mrs. Sparrow had also detected an unpleasant odor while she was showering on that day. She said that it caused her eyes to burn and that she had told her husband she was not going to take further showers. Walter Hudson, president of appellant, testified he had suggested that the heaters might be bad and in need of adjusting when Sparrow told him of the odor in the apartment and that Sparrow replied that this was about what the gas company employees had indicated. After Sparrow discovered the results of fire in the apartment, he changed the gas heaters in the living room and in the bathroom using the gas outlets which he said were already provided. He installed the new heaters, which he had bought. After the installation was complete, Sparrow and his father, an employee of the Arkansas Power & Light Company, made a check for escaping gas, and found none.

According to Sparrow, he arose at 6:00 a.m. on the day after he installed the new heaters, went to the bathroom and returned to bed where he remained until 6:30. He stated that he had not smoked a cigarette or ignited a match on this trip to the bathroom. He testified that both he and his wife then arose and that she went into the kitchen to prepare a pot of coffee, and he went

into the bathroom to light the heater. He was then wearing only his underwear. He said that he struck a match, lighted the heater and took a step toward the commode when the "whole room just blew up." He related that his hair, the shower curtain and the contents of the waste basket caught fire. Mrs. Sparrow testified that she heard an explosion and ran to the bathroom where she found her husband standing in the doorway trying to extinguish the fire in his hair and calling for help. She left but returned with a neighbor, who helped extinguish the fire in the apartment and take Sparrow to the hospital. Appellee's principal burns were on his left side, which would have been nearest the shower, according to his version of his position and movements between the time he entered the bathroom and the time of the fire or explosion. His wife described his left hand as badly burned.

Joe DeFatta, a licensed plumbing contractor, inspected all the gas lines in the building for a natural gas leak during March, at Hudson's request, and found none. He went back to the building later the same day with a gas company representative. A pressure test they conducted revealed no leak, but DeFatta then detected the odor of sewer gas in the bathroom. After determining that the gas came from the shower, DeFatta found that the drain from the shower was not equipped with a trap to prevent the backup of sewer gas, but was a vertical line connecting directly with the city sewer system. He said that the shower plumbing was not in compliance with the Arkansas Code. He was familiar with the characteristics of sewer gas and had seen it burn on several occasions. He described it as highly explosive, and said that it would just "flare off," make "one big flare" and then quit. He described this phenomenon as a "kind of an explosion."

The city fire marshall and an Arkansas Power & Light Company employee also inspected the apartment after Sparrow was burned, and both detected sewer gas arising from the shower drain. Neither the power company employee nor a gas company employee, who

also went to the apartment after the incident, found ·any gas leaks. A previous occupant, who testified on behalf of appellant, admitted that she kept a rubber stopper over the shower drain at all times.

Expert witnesses called by appellant admitted that natural gas will explode when mixed with air in sufficient concentration, that sewer gas may be of the same chemical composition as natural gas and that, if sewer gas is of sufficient concentration, it will burn, and within certain limits, explode.

Appellant argues that its motions for directed verdict should have been granted because this evidence left the jury to speculate as to the cause of the fire. It relies upon our opinions in *Glidewell, Admr.* v. *Arkhola Sand & Gravel Co.,* 212 Ark. 838, 208 S. W. 2d 4, and *Williams, Admr.* v. *Lauderdale,* 209 Ark. 418, 191 S. W. 2d 455. The opinion in the first case was principally predicated upon lack of evidence of negligence to remove the question from the realm of speculation. There was direct evidence of negligence here.

In *Williams* v. *Lauderdale,* the plaintiff sought to prove by the chief of the fire department that a fire which he reached shortly after the alarm was given, was caused by defective electrical wiring. Although he said that the "probable result" of the wiring "would cause a fire," the chief named a number of things which might have caused that fire—such as a match, a lighted cigarette, a pilot light or a hot water heater. Although it was his opinion that the bad wiring caused the fire, he stated that he did not know what caused the fire and did not testify as to any physical condition found in the damaged building that would indicate that the fire was caused by bad wiring and eliminate other possible causes, without speculation. When the evidence here is viewed in the light most favorable to appellee, the jury was not left with as little evidentiary basis for exclusion of speculation as was the case in *Williams.* While no witness in this case expressed an opinion as to the cause of the fire, and Sparrow admitted he did not know

what caused it, there was ample evidence that gas escaping into the room from the city sewer could have caused it and no evidence that anything else did. Appellant argues that appellee might have turned on the gas heater without lighting it when he first went into the bathroom so that enough gas escaped into the room to explode when he struck a match, and that this possibility is supported by the hospital emergency room report showing that the bathroom heater exploded. This result would depend upon sheer speculation. There is no evidence that the bathroom heater was turned on before Sparrow's second expedition into the room, and there is no indication whatever as to the hospital employee's source of information as to the cause of Sparrow's injury. There is no evidence here, as there was in *Williams,* of any other possible cause of the fire. Furthermore, the physical conditions found on the two occasions when there were burned linens and burned curtains in the apartment tend to support appellee's theory and supply an element which was lacking in *Williams.* Substantial support is further indicated by reason of the fact that there was testimony that the gas heater was burning both before and after the first fire and was not burning before the second.

We do not interpret *Williams* as requiring direct testimony as to the cause of the fire, or that the injured party state the cause. See *Fidelity Phenix Ins. Co.* v. *Lynch,* 248 Ark. 923, 455 S. W. 2d 79. Neither do we interpret *Williams* to require that in order to present a fact question a plaintiff must produce evidence to eliminate any possible cause which might be conceived, as distinguished from causes suggested by evidence in the case. In *Hill* v. *Maxwell,* 247 Ark. 811, 448 S. W. 2d 9, we recently said:

> On the element of causation, the authorities, Prosser, Torts § 41 (3d ed. 1964), point out that the burden of proof is upon the plaintiff and that he must sustain his proof of causation by more than speculation and conjecture. However it is not necessary that the plaintiff negative entirely the

possibility that the defendant's conduct was not a cause. It is enough that the plaintiff introduce evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. Stated another way, it is not required that the proof eliminate every possible cause other than the one on which plaintiff relies, but only such other causes, if any, as fairly arise from the evidence. See *Williams* v. *Reading Co.* (3d Cir. 1949) 175 F. 2d 32.

Appellant says that since appellee lost only $345 in wages and had only a $75 doctor bill and $396.85 in hospital expense, the remaining $6,683.15 awarded by the jury is attributable to pain and suffering, and is grossly excessive. While we feel that the jury award of damages was very liberal, we cannot say that it was so excessive as to require reversal or reduction. Sparrow had first and second degree burns on his face and about 35% of his body. His hair, eyebrows and eyelashes were burned. The burns on his left hand were the worst. Butter which his wife applied to his body immediately after the incident melted, and she said that he was black wherever the skin was burned. When his wife went to him in the bathroom, she found him crying and shaking very badly and terrified that he would be scarred and marred like an acquaintance who had been burned. He was still shaking badly when he was in the emergency room at the hospital. He was kept in the hospital for 11 days on sterile sheets. During that time he was given intravenous fluids and pain medication, principally non-narcotic, and his body sprayed with medication at regular intervals. Hospital records indicated administration of pain medication at least 20 times. He ran fever, and edema from the burns did not begin to subside until two days after he entered the hospital. Blebs on his hand had to be opened and blisters in several areas debrided. His physician gave him permission to return to work 10 days after his release from the hospital. Sparrow said he had a burned spot on his forehead and was burned on both hands and the left side of his body. He said the pain was like a burning

for four or five days, when it lessened. He did return to his work as a rug and carpet dyer at the time the doctor advised, but was unable to perform his full duties for five or six weeks. He just supervised the weighing and application of the chemicals because of the danger of infection. He testified that he suffered pain intermittently for a week or ten days after he left the hospital, but only took aspirin for relief. Photographs (about which we will comment later) indicate that Sparrow's burns were more than superficial.

Measurement of pain and suffering and translating it into dollar compensation is an exercise of extreme difficulty. Generally, it is best left to jurors who are called upon to apply their own observations, common knowledge and everyday experience in the affairs of life to the evidence. See AMI 102, Civil. No court has yet provided a yardstick for a jury's use in meeting this portion of its responsibility. The human mind has not yet been able to devise any better gauge than the verdict of a jury based upon the collective judgment of its members. Appellate courts are naturally and appropriately extremely reluctant to reverse or reduce a jury's verdict on such an element of damages. We do not feel that we would be justified in doing so here. We acknowledged in *Breitenberg* v. *Parker*, 237 Ark. 261, 372 S. W. 2d 828, that we could not constitutionally reduce a verdict if there was *any* substantial evidence, when given its highest probative force, to support it. We also reiterated the bases upon which a verdict will be set aside as excessive as: (1) the absence of any evidence on which the amount allowed could properly have been awarded; (2) where the verdict must of necessity be for a smaller sum than that awarded; (3) where the testimony most favorable to the successful party will not sustain the inference of fact on which the damages are estimated; (4) where the amount awarded is so excessive as to lead to the conclusion that the verdict was the result of passion and prejudice or of some error or mistake of principle, or to warrant the conclusion that the jury was not governed by the evidence. We could not, in good conscience, say that any of these bases existed in this case.

The most difficult question posed by appellant relates to the introduction of photographs offered by appellee to demonstrate the location and extent of the burns on his body. The pictures exhibited were apparently taken after Sparrow left the hospital. They appear in the record with rather vivid coloration on certain parts of Sparrow's body, most of which is due to medication placed upon the burns for the purpose of more clearly delineating them for the camera. Their potential effect is best demonstrated by appellee's concession that the pictures would have been such an unfair representation as to require their exclusion if they could have misled the jury to believe that the appearance of the medication reflected the true appearance of the burns. We agree and would not hesitate to hold that the circuit judge abused his discretion in admitting the pictures were it not for the fact that it was made perfectly clear at the time the pictures were offered and before they were exhibited to the jury that the burned portions of appellee's body shown in the pictures were covered with medication used to help form a crust and develop scabs over the burns. With this fact made clear, we do not believe that the jury could have been misled, as appellee points out, and surely the jury observed that a picture taken to show the burned area on the back of appellee's left hand discloses a burned area on his left leg without the medication. Yet when a picture showing only the outside of appellee's left leg was taken, medication had been placed on the leg. There is no reversible error in the trial court's admission of pictures showing injuries to a party into evidence, even though they are inflammatory, if the picture is an aid to make the testimony of witnesses more easily understood. *Reed* v. *McGibboney*, 243 Ark. 789, 422 S. W. 2d 115. We find no error in this respect.

The judgment is affirmed.

HARRIS, C. J. and BROWN and JONES, JJ., dissent.

CARLETON HARRIS, Chief Justice, dissenting. I would reverse this case since it is my view that the trial court

abused its discretion in permitting exhibits 5, 6, 7, and 8 to be offered into evidence. It is difficult for me to see any burns at all, though it is easy to see the reddish-orange medication on the body. This medication appears to be generously applied, and since the photographs are in natural color (rather than black and white) it is my opinion that the pictures are misleading in their portrayal of the extent of the burned portions. In fact, though not implying that it was done in the present situation, the photographs of the reddish medication are so striking to the eye, that I am of the opinion that a perfectly normal part of the body could be painted with this medication and the impression be left that serious injury had occurred.

I am also of the view that the verdict was excessive, Mr. Sparrow receiving an award, after the payment of all expenses, of $6,683.15. While I recognize that burns are very painful, it does not appear that there was unusual suffering in this instance since a non-narcotic pain reliever was sufficient, and Sparrow only remained in the hospital for eleven days. Dr. Lee testified that no permanent disability was suffered, and Sparrow was permitted to return to work three weeks after the occurrence. This means that he received better than $2,200 per week for pain and suffering. It is my view that this amount was excessive; however, since I would reverse on the first point, there is no necessity to go into this last matter.

I respectfully dissent.

I am authorized to state that Brown, J., joins in this dissent.

Jones, J., joins in this dissent as to the reversal on the first point discussed.